**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) ) ) | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| _____ | ) ) | |
| In Re: | ) ) | |
| _SWITCHES_ CASES | ) ) ) ) | **Jury Trial Demanded** |
| _____ | ) ) | |
| THIS RELATES TO: | ) ) | Case No. _____ |
| GROUP 1 AUTOMOTIVE, INC. AS ASSIGNEE ON BEHALF OF GROUP 1 AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, ASBURY AUTOMOTIVE GROUP, INC. AS ASSIGNEE ON BEHALF OF ASBURY AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, VAN TUYL GROUP, LLC AS ASSIGNEE ON BEHALF OF ASSIGNOR DEALERSHIPS, AND MAJOR AUTOMOTIVE COMPANIES, INC. AS ASSIGNEE ON BEHALF OF MAJOR AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, BRONX FORD, INC., AND CITY WORLD MOTORS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| TOKAI RIKA, CO., LTD., AND TRAM, INC. D/B/A/ TOKAI RIKA U.S.A. INC., | ) ) ) ) | |
| Defendants. | ) | |

1

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Group 1 Automotive, Inc. as Assignee on Behalf of Group 1 Automotive Wholly-owned Subsidiary Dealerships, Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships, Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships, and Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships, Bronx Ford, Inc., and City World Motors, LLC (collectively, "Plaintiffs") file this Original Complaint (the "Complaint") against Defendants Tokai Rika, Co., Ltd., TRAM, Inc. d/b/a/ Tokai Rika U.S.A. Inc. (collectively, "Tokai Rika" or "Defendants"). For their Complaint, Plaintiffs state as follows:

### I.  NATURE OF ACTION

1.      The global conspiracy to fix the prices of various automotive parts in violation of multiple countries' antitrust laws has resulted in the "biggest criminal antitrust investigation that [the Department of Justice has] ever encountered…with respect to the impact on U.S. business and consumers, and the number of companies and executives that are subject to the investigation."[1] The United States alone has levied billions of dollars in fines and multiple companies and executives have pled guilty to various antitrust charges. Dozens of civil lawsuits have been filed as well, including several class actions from both direct purchaser and indirect purchasers of dozens of automotive parts. This action concerns the conspiracy to unlawfully fix the prices of Switches and the substantial harm that conspiracy has caused Plaintiffs, who comprise some of the largest groups of automobile dealerships in the country.

2.      Switches are levers installed in various locations within a vehicle that the driver

---

[1] https://www.law360.com/articles/416139/doj-widens-antitrust-probe-into-auto-parts-industry.

uses to operate various functions within the vehicle. Switches include steering wheel switches, turn switches, wiper switches, combination switches, door courtesy switches, and combinations thereof.

3.      Switches are essential components of a vehicle.  As explained further below, Defendants control a significant portion of the market and, therefore, were able to engage in a massive price-fixing conspiracy against nearly the entire global automotive industry for over a decade.  Defendants' conduct raised the prices of vehicles containing Switches.  The harm Defendants intentionally caused to Plaintiffs and others is substantial and constitutes an antitrust injury under both federal and state laws as set forth below.

4.      Plaintiffs bring this action to recover for this harm for Switches and/or vehicles containing Switches purchased by Plaintiffs, manufactured by Defendants or any co-conspirator, during the period from January 1, 2000 to the present (the "Relevant Time Period").

## II. JURISDICTION AND VENUE

5.      This action arises under Section 16 of the Clayton Act (15 U.S.C. § 26) for Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  Thus, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.  Plaintiffs also assert various state law claims. This Court has subject matter jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §§ 1332(a) and 1367 as Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interests and costs.

6.      Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §§1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or

more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

7.     This Court has jurisdiction over each Defendant because each either directly or through the ownership and/or control of its United States subsidiaries:  (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Switches designed for vehicles to be sold throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) colluded with conspirators who engaged in conspiratorial conduct in the United States, including in this district; and/or (e) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

8.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and upon import trade and commerce within the United States.

9.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

10.     Switches manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States

are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Switches are purchased in the United States, and such Switches do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs in the United States.

11.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Switches, and that conspiracy unreasonably restrained trade and adversely affected the market for Switches.

12.     Defendants' conspiracy and wrongdoing injured Plaintiffs who indirectly purchased vehicles containing Switches.

### III. PARTIES

#### a.  **Plaintiffs**

13.     Plaintiff Group 1 Automotive, Inc. as Assignee on Behalf of Group 1 Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Houston, Texas.  The wholly-owned subsidiary dealerships identified on the attached Exhibit A have assigned their claims to Group 1 Automotive, Inc.  The dealerships are (or have been) authorized dealers for at least the following:  Audi, BMW, Buick, Chevrolet, Chrysler, Dodge, Ford, GMC, Honda, Hyundai, Infiniti, Jeep, Kia, Lexus, Lincoln, Mazda, Mercedes-Benz, Mini, Mitsubishi, Nissan, Plymouth, Pontiac, Porsche, Ram, Scion, Smart, Subaru, Suzuki, Toyota, Volkswagen, and Volvo.  Group 1 Automotive, Inc. as Assignee on Behalf of Group 1

Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Group 1 Automotive") purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants. Group 1 Automotive purchased and received the Switches and/or vehicles containing Switches in the following states: California, Florida, Kansas, Massachusetts, Mississippi, New Hampshire, New Mexico, New York, and South Carolina. Group 1 Automotive has also displayed, sold, serviced, and advertised its vehicles in those states during the Relevant Time Period. Accordingly, Group 1 Automotive has been forced to pay Defendants' supra-competitive prices. Group 1 Automotive, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

14. Plaintiff Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Duluth, Georgia. The wholly-owned subsidiary dealerships identified on the attached Exhibit B have assigned their claims to Asbury Automotive Group, Inc. The dealerships are (or have been) authorized dealers for at least the following: Acura, Audi, BMW, Buick, Cadillac, Chevrolet, Chrysler, Daewoo, Dodge, Ford, GMC, Honda, Hyundai, Infiniti, Isuzu, Jaguar, Jeep, Kia, Land Rover, Lexus, Lincoln, Mazda, Mercedes-Benz, Mini, Mitsubishi, Nissan, Pontiac, Porsche, Toyota, Scion, Subaru, Suzuki, Volkswagen, and Volvo. Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Asbury Automotive") purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants. Asbury Automotive purchased and received the Switches and/or vehicles containing Switches in the following states: Arkansas, California, Florida, Missouri, Mississippi, North Carolina, Oregon, and South Carolina. Asbury Automotive has also displayed, sold,

serviced, and advertised its vehicles in those states during the Relevant Time Period. Accordingly, Asbury Automotive has been forced to pay Defendants' supra-competitive prices. Asbury Automotive, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

15.     Plaintiff Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships is a Delaware limited liability company with its principal place of business in Irving, Texas.  The assignor dealerships identified on the attached Exhibit C have assigned their claims to Van Tuyl Group, LLC.  The dealerships are (or have been) authorized dealers for at least the following: Acura, Alpha Romeo, Audi, BMW, Buick, Cadillac, Chevrolet, Chrysler, Dodge, Fiat, Ford, GMC, Honda, Hyundai, Infiniti, Jeep, Kia, Lexus, Lincoln, Mazda, Nissan, Subaru, Toyota, Volkswagen, and Volvo.  Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships (hereinafter, "VTG") purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants.   VTG purchased and received the Switches and/or vehicles containing Switches in the following states:  Arizona, California, Florida, Illinois, Missouri, Nebraska, and New Mexico.  VTG has also displayed, sold, serviced, and advertised its vehicles in those states during the Relevant Time Period. Accordingly, VTG has been forced to pay Defendants' supra-competitive prices.   VTG, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

16.     Plaintiff Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Long Island City, New York.  The wholly-owned subsidiary dealerships identified on the attached Exhibit D have assigned their claims to Major Automotive Companies,

Inc.  The dealerships are (or have been) authorized dealers for at least the following: Chevrolet, Chrysler, Jeep, and Dodge.  Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Major Automotive") purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants.  Major Automotive purchased and received the Switches and/or vehicles containing Switches in New York.  Major Automotive has also displayed, sold, serviced, and advertised its vehicles in New York during the Relevant Time Period. Accordingly, Major Automotive has been forced to pay Defendants' supra-competitive prices.   Major Automotive, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

17.     Plaintiff Bronx Ford, Inc. is a Delaware corporation with its principal place of business in Bronx, New York.  Bronx Ford, Inc. operates a dealership under the trade name City World Ford, formerly known as Bronx Ford Lincoln Mercury, Inc. and doing business as City World Ford Lincoln Mercury.  The dealerships are (or have been) authorized dealers for at least the following: Ford and Lincoln. Bronx Ford purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants. Bronx Ford brings claims on behalf of its dealership located in New York.  Bronx Ford has also displayed, sold, serviced, and advertised its vehicles in New York during the Relevant Time Period.  Accordingly, Bronx Ford has been forced to pay Defendants' supra-competitive prices.  Bronx Ford, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

18.     Plaintiff City World Motors, LLC is a Delaware corporation with its principal place of business in Bronx, New York.  City World Motors, LLC operates a dealership under the

trade name City World Toyota Scion.  The dealership is (or has been) an authorized dealer for at least the following: Toyota and Scion.  City World Motors, LLC (hereinafter, "City World Motors") purchases new vehicles containing Switches manufactured by Defendants and/or replacement parts for Switches manufactured by Defendants.  City World Motors brings claims on behalf of its dealership located in New York.  City World Motors has also displayed, sold, serviced, and advertised its vehicles in New York during the Relevant Time Period. Accordingly, City World Motors has been forced to pay Defendants' supra-competitive prices.  City World Motors, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

### b.  Defendants

#### i.  Tokai Rika Defendants

19.     Defendant Tokai Rika Co., Ltd. is a Japanese corporation with its principal place of business in Aichi, Japan. Defendant Tokai Rika Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Switches that were purchased throughout the United States, including in this district, during the Relevant Time Period.

20.     Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Tokai Rika Co., Ltd. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. manufactured, marketed, and/or sold Switches that were purchased throughout the United States, including in this district, during the Relevant Time Period.

### c.  Agents and Co-Conspirators

21.     Each Defendant acted as the principal of or agent for other Defendants with

respect to the acts, violations, and common course of conduct alleged.

22.     On information and belief, additional persons and entities participated as co-conspirators with Defendants in the conspiracy and performed acts in furtherance of the conspiracy and anti-competitive conduct.  Such entities include Panasonic Corporation, Panasonic Corporation of North America (together, "Panasonic"), Mitsuba Corporation, and American Mitsuba Corporation (together, "Mitsuba").  The identities of additional such persons and entities are currently unknown.

23.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## IV. PROCEDURAL HISTORY

24.     In the wake of the DOJ's investigations and criminal convictions described herein, automobile dealers, buyers, and others began filing class action lawsuits against automotive parts manufacturers, including Defendants, in United States district courts across the country on behalf of direct and indirect purchasers of various automobile parts.

25.     In February 2012, the Panel on Multidistrict Litigation consolidated the existing actions in the United States District Court for the Eastern District of Michigan, styled *In re: Automotive Parts Antitrust Litigation*, 2:12-md-02311. Since the beginning of the MDL, numerous additional suits alleging price fixing on automobile parts, including Switches, have been combined.

26.     In May 2016, the United States District Court for the Eastern District of Michigan

gave final approval for settlements with certain defendants ("First Group" settlements) providing benefits to eligible automobile dealers related to the massive antitrust conspiracy to fix the prices of automotive parts.  Plaintiffs did not opt-out of the First Group.

27.     In November 2016, the United States District Court for the Eastern District of Michigan gave final approval for additional settlements with certain defendants ("Second Group" settlements). Plaintiffs opted-out of the Second Group.

28.     In November 2018, the United States District Court for the Eastern District of Michigan gave final approval for additional settlements with certain defendants ("Third Group" settlements). Plaintiffs opted-out of the Third Group.

29.     In late 2018 and 2019, the United States District Court for the Eastern District of Michigan preliminarily approved the proposed settlement of claims of eligible automobile dealerships for automotive parts, including Switches, against certain additional defendants ("Fourth Group" settlements). *See* Exhibit E.

30.     Pursuant to Rule 23, the Court ordered the parties in the class action to provide notice to the absent class members advising them of, among other things, their right to opt-out of any of the proposed settlements in the Fourth Group.

31.     Plaintiffs properly exercised their right to opt out from settlements related to automotive parts in the Fourth Group, including Switches, prior to the opt-out deadline provided in the notice.

32.     As set forth herein, Defendants engaged in a massive, anti-competitive conspiracy to raise the prices of Switches above competitive levels.   As a result, Plaintiffs, who are automobile dealers, paid supra-competitive prices for Switches and/or vehicles containing Switches.   Defendants have caused Plaintiffs substantial antitrust injuries to their business and

property.  As such, Plaintiffs now bring this action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, unjust enrichment and consumer protection laws, and demand a trial by jury.

## V.  FACTUAL ALLEGATIONS

### a.  Switches Market

33.    Defendants manufacture, market, and sell automotive parts including, relevant to this lawsuit, Switches.

34.    Switches are generally comprised of the parts in an automotive vehicle that protect drivers and passengers from bodily harm, including seat belts, air bags, steering wheels (or steering systems), and safety electronic systems.

35.    Defendants supplied Switches to original equipment manufacturers ("OEMs"), mostly large automotive manufacturers, for installation in vehicles manufactured and/or sold in the United States and as replacement parts.

36.    OEMs purchase parts for U.S.-manufactured vehicles both in the United States and abroad.  Before production of a new automobile model begins, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  These RFQs may be issued for model-specific parts for that model of automobile or for a specific engine to be incorporated into multiple models.  In response, automobile parts suppliers submit bids to the OEMs.  The OEMs then select a supplier based on its bid.

37.    OEMs install Switches in new automobiles as part of the manufacturing process. Defendants supply OEMs with Switches to be installed in new automobiles.  Suppliers, including Defendants, also supply OEMs with Switches to be used for replacement purposes.

38.    OEMs in turn supply Switches to automobile dealerships, including Plaintiffs,

either as a component part installed in a new automobile or as a replacement part.  Replacement Switches sold by OEMs to dealerships are the same as Switches installed in an automobile. They are not after-market parts, which are made by different manufacturers.  Accordingly, Plaintiffs indirectly purchased Switches from Defendants.

### b.  Defendants' Conspiracy and Anti-Competitive Conduct

39.     At times when demand for automobiles decreased during the Relevant Time Period, the prices for Switches remained flat or increased, contravening basic principles of supply and demand. In a competitive market, falling demand would lead to decreased prices because competitors would need to lower prices in order to attract customers and increase demand.

40.     The nature of the Switches market in the United States, however, is conducive to a price-fixing agreement, and has made collusion particularly attractive in this market. Specifically, the Switches market: (1) has high barriers to entry and (2) has inelasticity of demand.

41.     Where a group has entered into a conspiracy to raise prices above competitive levels for a particular market, new companies would seemingly use that as an opportunity to enter that market with more competitive pricing.  This is less likely to occur where there are significant barriers to entering the market at issue.

42.     Significant barriers to entry exist in the Switches market.  First, a new company would face high start-up costs, including millions of dollar costs related to manufacturing plants, equipment, energy, transportation, distribution infrastructure, and customer relationships.

43.     Defendants also own multiple patents related to Switches.  New entrants in the Interior Trim(s) market must avoid infringing Defendants' patents, potentially at significant cost

to the new entrant.

44.     Finally, OEMs cannot freely swap out one Switches supplier for another. Switches and vehicles are designed to integrate with one another.  An OEM designs a vehicle such that Switches purchased for that vehicle integrate with the other components of that particular model.  It would be difficult for a new entrant to enter the market after a vehicle has been specifically designed to integrate with particular Switches.  This contributes to the high barrier to entering the Switches market.

45.     Regarding inelasticity of demand, there is inelasticity of demand for Interior Trim(s).  "Elasticity is a measure of a variable's sensitivity to a change in another variable."[2] Price elasticity of demand is "a measure of the relationship between a change in the quantity demanded of a particular good and a change in its price."[3]   "If a small change in price is accompanied by a large change in quantity demanded, the produce is said to be elastic (or responsive to price changes).  Conversely, a product is inelastic if a large change in price is accompanied by a small amount of change in quantity demanded."[4]  Customers who have no cheaper alternative for a product with inelastic demand are forced to continue to purchase the product at higher prices.  Thus, inelastic demand in a market facilitates conspiring by allowing producers to raise their prices without fear of losing sales to other substitute products (or customers not buying the product at all).

46.     Demand for Switches is highly inelastic.  No close substitute products exist. Switches are an essential part of every vehicle and must be purchased even if prices are raised.

---

[2] http://www.investopedia.com/terms/e/elasticity.asp
[3] http://www.investopedia.com/terms/p/priceelasticity.asp
[4] *Id.*

### c. Government Investigations

47.     As discussed above, government investigations into the rampant automotive parts industry antitrust conspiracies are well documented.  The DOJ continues to investigate the "price fixing, bid rigging and other anticompetitive conduct in the automotive parts industry…A total of 65 individuals and 47 companies have been charged in the Antitrust Division's investigations into the automotive parts industry."[5]  The DOJ has described the investigation as the largest criminal investigation it has ever undertaken.  The DOJ has thus far fined companies over $2.9 billion related to this investigation and sentenced dozens to jail terms.[6]

48.     The DOJ's investigation into illegal bid rigging and price fixing in the automotive parts industry began as a part of a global effort including the European Union and Japan.  In February 2010 and in June 2010, the European Commission ("EC") conducted raids on the offices of several defendants.  Also in February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric, and Yazaki Corporation, seeking evidence of collusion in the industry.  Finally, FBI investigators raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.

49.     To date, the DOJ's criminal investigation of illegal price fixing and bid rigging in the automotive parts industry has likewise resulted in the filing of criminal charges against numerous automotive parts manufacturers. Criminal fines specifically related to the Switches market include:

        a.  On August 6, 2013, Panasonic Corporation plead guilty to three counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $45.8

---

[5] https://www.justice.gov/opa/pr/auto-parts-industry-executive-pleads-guilty-obstruction-justice.
[6] https://www.law360.com/foodbeverage/articles/885906/trends-to-watch-in-doj-cartel-investigations-this-year.

million for conspiring to rig bids, fix prices, and otherwise restrain trade of HID ballasts, Switches, and steering angle sensors. According to the DOJ, Panasonic and its Co-Conspirators:

   i. Participated in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to Toyota in the United States and elsewhere.

   ii. Agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Toyota in the United States and elsewhere.

   iii. Agreed, during those meetings, conversations, and communications, to allocate the supply of Switches sold to Toyota in the United States and elsewhere on a model-by-model basis.

   iv. Agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by Toyota in the United States and elsewhere.

   v. Submitted bids, price quotations, and price adjustments to Toyota in the United States and elsewhere in accordance with the agreements reached.

   vi. Sold the Switches to Toyota in the United States and elsewhere at collusive and noncompetitive prices.

   vii. Accepted payment for the Switches sold to Toyota in the United States and elsewhere at collusive and noncompetitive prices.

   viii. Engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

   ix. Employed measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

50. Dozens of additional companies and individuals have plead guilty to price fixing in the broader automotive parts industry as a result of the DOJ's investigations, including:

   a. On March 1, 2012, Yazaki Corporation plead guilty to three counts of

Conspiracy to Restrain Trade and agreed to pay a criminal fine of $470 million for conspiring to rig bids and fix prices of automotive wire harnesses, instrument panel clusters, and fuel senders.

b.  On March 5, 2012, DENSO Corporation plead guilty to two counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $78 million for conspiring to rig bids and fix prices of electrical control units and heater control panels.

c.  On May 16, 2012, G. S. Electech, Inc. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $2.75 million for conspiring to rig bids and fix prices of speed sensor wire assemblies.

d.  On June 21, 2012, Fujikura LTD plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $20 million for conspiring to rig bids and fix prices of automotive wire harnesses.

e.  On June 21, 2012, Autoliv, Inc. plead guilty to two counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $14.5 million for conspiring to rig bids, fix prices, and otherwise restrain trade of seatbelts, airbags and steering wheels.

f.  On September 25, 2012, TRW Deutschland Holding GmbH plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $5.1 million for conspiring to rig bids and fix prices of seatbelts, airbags and steering wheels.

g.  On November 8, 2012, Nippon Seiki Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $1 million

for conspiring to rig bids and fix prices of instrument panel clusters.

h.  On December 12, 2012, Tokai Rika Co. Ltd. plead guilty to one count of Conspiracy to Restrain Trade and one count of Obstruction of Justice and agreed to pay a criminal fine of $17.7 million for conspiring to rig bids and fix prices of heater control panels.

i.  On July 2, 2013, Furukawa Electric Company, Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $200 million for conspiring to rig bids and fix prices of automotive wire harnesses.

j.  On September 11, 2013, Diamond Electric Mfg. Co. Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $19 million for conspiring to rig bids, fix prices, and otherwise restrain trade of ignition coils.

k.  On October 21, 2013, Yamashita Rubber Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $11 million for conspiring to rig bids and fix prices of anti-vibrational rubber parts.

l.  On November 5, 2013, Valeo Japan Co., LTD. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $13.6 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of air conditioning systems.

m.  On November 6, 2013, Mitsubishi Electric Corporation ("Mitsubishi") plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $190 million for conspiring to rig bids, fix prices, and otherwise restrain trade of starter motors, alternators, and ignition coils.

n.  On November 6, 2013, Mitsuba Corporation plead guilty to one count of Conspiracy to Restrain Trade and one count of Obstruction of Justice and agreed to pay a criminal fine of $135 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of windshield washer and wiper systems, starter motors, power window motors, and fan motors.

o.  On November 6, 2013, Mitsubishi Heavy Industries, Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $14.5 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of compressors and condensers.

p.  On November 7, 2013, Hitachi Automotive Systems, Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $195 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters, and motor generators.

q.  On November 13, 2013, T.RAD Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and one count of Obstruction of Justice and agreed to pay a criminal fine of $13.75 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of radiators and ATF warmers.

r.  On December 5, 2013, Takata Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $71.3 million for conspiring to rig bids, fix prices, and otherwise restrain trade of

seatbelts.

s.   On January 23, 2014, Stanley Electric Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $1.44 million for conspiring to rig bids, fix prices, and otherwise restrain trade of HID ballasts.

t.   On February 7, 2014, Toyo Tire & Rubber Co., LTD. plead guilty to two counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $120 million for conspiring to rig bids, fix prices, and otherwise restrain trade of anti-vibrational rubber parts and constant velocity joint boots.

u.   On February 11, 2014, Koito Manufacturing Co., Ltd. plead guilty to two counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $56.6 million for conspiring to rig bids, fix prices, and otherwise restrain trade of HID ballasts and lighting fixtures.

v.   On March 5, 2014 Aisan Industry Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $6.86 million for conspiring to rig bids, fix prices, and otherwise restrain trade of electronic throttle bodies.

w.   On April 20, 2014, Bridgestone Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $425 million for conspiring to rig bids, allocate customers, and fix prices of anti-vibrational rubber parts.

x.   On July 8, 2014, NSK Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $68.2 million for conspiring to rig

bids, fix prices, allocate customers, and otherwise restrain trade of bearings.

y.  On July 9, 2014, JTEKT Corporation plead guilty to two counts of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $103.27 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of bearings and electric powered steering assemblies.

z.  On October 3, 2014, Riverside Seat Company, Woodbridge Foam Fabricating, Inc., and SW Foam LLC plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $6,148,800 collectively for conspiring to fix prices and otherwise restrain trade of polyurethane foam.

aa. On October 8, 2014, NGK Spark Plug Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $52.1 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of spark plugs, standard oxygen sensors, and air fuel ratio sensors.

bb. On October 21, 2014, Showa Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $19.9 million for conspiring to rig bids, fix prices, and otherwise restrain trade of electronic power steering assemblies.

cc. On December 16, 2014, Toyoda Gosei Co., LTD. plead guilty to two count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $26 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of certain automotive hoses, airbags, and steering wheels.

dd. On January 23, 2015, Hitachi Metals, Ltd. plead guilty to one count of

Conspiracy to Restrain Trade and agreed to pay a criminal fine of $1.25 million for conspiring to rig bids, allocate customers, and fix prices of brake hoses.

ee. On February 10, 2015, Aisin Seiki Co., LTD. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $35.8 million for conspiring to rig bids, allocate customers, fix prices, and otherwise restrain trade of variable timing devices.

ff. On March 31, 2015, Sanden Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $3.2 million for conspiring to rig bids, fix prices, and otherwise restrain trade on compressors.

gg. On April 1, 2015, Continental Automotive Electronics LLC plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $4 million for conspiring to rig bids on instrument panel clusters.

hh. On April 24, 2015, Minebea Co., LTD plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $13.5 million for conspiring to fix prices and otherwise restrain trade on bearings.

ii. On June 22, 2015, Robert Bosch GmbH plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $57.8 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade on spark plugs, oxygen sensors, and starter motors.

jj. On June 24, 2015, Yamada Manufacturing Co. Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $2.5

million for conspiring to rig bids, fix prices, and otherwise restrain trade of steering columns.

kk. On November 2, 2015, Kayaba Industry Co LTD plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $62 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of shock absorbers.

ll. On November 16, 2015, NGK Insulators, Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $65.3 million for conspiring to rig bids and fix prices of ceramic substrates for automotive catalytic converters.

mm.   On January 22, 2016, Inoac Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $2.35 million for conspiring to rig bids, allocate customers, and fix prices plastic interior trim.

nn. On May 17, 2016, Corning International Kabushiki Kaisha plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $66.5 million for conspiring to rig bids, allocate customers, and fix prices of ceramic substrates for emission control systems.

oo. On June 13, 2016, Omron Automotive Electronics Co., Ltd. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $4.55 million for conspiring to rig bids on power window switches.

pp. On September 1, 2016, Nishikawa Rubber Co., LTD. plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of

$130 million for conspiring to rig bids, allocate customers, and fix prices on automotive body sealing products.

qq. On December 24, 2016, Alpha Corporation plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $9 million for conspiring to rig bids, fix prices, allocate customers, and otherwise restrain trade of automotive access mechanisms.

rr. On February 17, 2017, Hitachi Automotive Systems Ltd plead guilty to one count of Conspiracy to Restrain Trade and agreed to pay a criminal fine of $55.48 million for conspiring to rig bids, allocate customers, and fix prices on shock absorbers.

ss. On March 7, 2017, the DOJ announced that Keikert AG had agreed to plead guilty and pay a $6.1 million criminal fine for conspiring to rig bids of side-door latches and latch minimodules.

tt. On May 31, 2018, Maruyasu Industries Co. Ltd. plead guilty and was sentenced to pay a $12 million criminal fine for its role in conspiring to rig bids, allocate customers, and fix prices on automotive steel tubes.

51.  The sprawling number of indictments and guilty pleas related to the global conspiracy to rig bids and fix prices of various automotive parts is shocking.

## VI.   COMPETITIVE INJURY

52.  Defendants' conspiracy has harmed each Plaintiff.  The cost of vehicles containing Switches are supra-competitive because of Defendant's conduct.  But for Defendants' conspiracy, automobile dealers, including Plaintiffs, would not have paid such supra-competitive, artificially inflated prices.  Absent the supra-competitive prices, Plaintiffs would be

able to gain the benefits of competition as to Switches, which would reduce the prices to a competitive level.  Plaintiffs purchased vehicles containing Switches from OEMs who had purchased the Switches from Defendants.  Thus, Plaintiffs paid higher prices for vehicles containing Switches than they otherwise would have paid absent Defendant's conspiracy and conduct.

53.    Each Plaintiff absorbed a substantial portion of the overcharges that they paid due to Defendants' illegal activities.  Plaintiffs did not pass on all overcharges caused by Defendants' illegal activities.

54.    Switches are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Switches follow a traceable physical chain of distribution from Defendants to Plaintiffs, and any costs attributable to Switches can be traced through the chain of distribution to Plaintiffs.

55.    The market for Switches and the market for automobiles are inextricably linked and intertwined because the market for Switches exists to serve the automobile market.  As antitrust scholars Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) have recognized, "in a multiple level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[7] Without the automobiles, the Switches have little to no value.  The demand for automobiles creates the demand for Switches.  Thus, the artificially inflated prices of Switches in new

---

[7] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269, 276 (1979).

automobiles as a result of Defendants' conspiracy have been passed to the indirect-purchaser Plaintiffs.

56.     Well-accepted economic models can quantify the specific overcharge impacting the prices of motor vehicles containing Switches.  For example, economists use "regression analysis" to isolate and understand the relationship between an "explanatory" variable and a "dependent" variable when numerous, changing variables exist.  Using regression analysis, it is possible to isolate and identify the impact of an increase in the price of Switches (explanatory variable) on prices for new motor vehicles (dependent variable) even though such products contain a number of other components whose prices may be changing over time.  Thus, the precise amount of overcharge passed on to indirect purchasers as a result of Defendants' unlawful conspiracy can be measured.

57.     Defendants' conspiracy restrained competition in the United States, including in all states that permit the recovery of damages by indirect purchasers, and had substantial effects on the commerce of the United States.

## VII.    DISCOVERY RULE AND FRAUDULENT CONCEALMENT

58.     Plaintiffs had no knowledge of Defendants' conduct and conspiracy, as alleged herein, and had no reason to know of such conduct until, at the earliest, the DOJ's public announcement of Panasonic's anticipated guilty plea.  Plaintiffs had no knowledge or reason to know of the existence of the conspiracy prior to that date.  Plaintiffs are automobile dealers who had no direct contact or interaction with any of Defendants and no means to discover the conspiracy.

59.     Defendants further took affirmative steps to conceal their misconduct.  Defendants kept their agreements, understandings and conspiracies secret.  A price-fixing

conspiracy such as this one is, by its very nature, secretive.  As explained in the Informations filed against several Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.

60.     Plaintiffs could not have discovered the alleged conspiracy and conduct at an earlier date by the exercise of reasonable diligence.

61.     Thus, the discovery rule and Defendants' fraudulent concealment have tolled the running of any applicable statutes of limitations.

62.     Any applicable statutes of limitations as to Plaintiffs have been further tolled by the pending class actions.

## VIII.   CLAIMS

### a.   Count 1 – Violation of Section 1 of the Sherman Act

63.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

64.     Defendants and unnamed conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

65.     The acts done by each of Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

66.     At least as early as January 1, 2000, and continuing through at least the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to rig bids for and to artificially fix, raise, stabilize and control prices for Switches thereby creating anticompetitive effects.

67.     The anti-competitive acts were intentionally directed at the United States market for Switches and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Switches throughout the United States.

68.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Switches.

69.     As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs have been harmed by purchasing Switches or vehicles containing Switches manufactured by Defendants or their co-conspirators by being forced to pay inflated, supra-competitive prices for such products.

70.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and courses of conduct set forth herein.

71.     Defendants' conspiracy had the following effects, among others:

a.  Price competition in the market for Switches has been restrained, suppressed and/or eliminated in the United States;

b.  Prices for Switches sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Plaintiffs who purchased Switches, or vehicles containing Switches manufactured by Defendants and their co-conspirators have been deprived of the benefits of free and open competition and have been forced to pay artificially inflated prices for such products.

72.     Plaintiffs have been injured and will continue to be injured in their business and property by paying more for Switches or vehicles containing Switches manufactured by Defendants and their co-conspirators than they would have paid and will pay in the absence of

the conspiracy.

73.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

74.     Plaintiffs are entitled to an injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein.

**b.   Count 2 – Violation of State Antitrust Statutes**

75.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

76.     From as early as January 1, 2000 through at least the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Switches in an unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

77.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for Switches and to allocate customers for Switches in the United States.

78.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    a.   Participating in meetings and conversations among themselves during which they agreed to price Switches at certain levels and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs with respect to Switches sold in the United States;

    b.   Allocating customers and markets and rigging bids for Switches in the United States in furtherance of their agreements; and

    c.   Participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

79.     Defendants and their co-conspirators engaged in the actions described above for

the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices, to rig bids and to allocate customers with respect to Switches.

80.     The anti-competitive acts were intentionally directed at the market for Switches in all states in which Plaintiffs do business allowing indirect purchasers to collect damages and had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Switches throughout those states.

81.     Plaintiffs were deprived of free and open competition in all states, including all states in which Plaintiffs do business allowing indirect purchasers to collect damages, and Plaintiffs paid supra-competitive, artificially inflated prices for Switches in all states in which Plaintiffs do business allowing indirect purchasers to collect damages.

82.     Defendants' anticompetitive, unfair acts described above were knowing, willful and constitute flagrant violations of the below-listed state antitrust statutes.

83.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

      a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

      b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected Arizona commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

84.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§16700, *et seq.*

a.  During the Relevant Time Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Switches at supra-competitive levels.

b.  The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Switches.

c.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and

course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Switches; and (2) Allocating among themselves the production of Switches.

d.   The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the sale of Switches has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Switches sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Switches or vehicles containing Switches manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property in that they paid more for Switches than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

85.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed,

and eliminated throughout Kansas; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

86.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

a. Defendants 'and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs, including those who resided in Mississippi and/or purchased Switches or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi, and (4) Plaintiffs, including those who

resided in Mississippi and/or purchased Switches or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Switches, including in Mississippi.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

87.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

88.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

    a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

    b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et*

*seq*. Accordingly, Plaintiffs seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

89.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

    a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

    b.   During the Relevant Time Period, Defendants' illegal conduct substantially affected New Mexico commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Accordingly, Plaintiffs seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

90.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

    a.   Defendants' and their co-conspirators' combinations or conspiracies had the

following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout New York; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs, including those who resided in New York and/or purchased Switches or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs, including those who resided in New York and/or purchased Switches or vehicles in New York, paid supra-competitive, artificially inflated prices for Switches when they purchased, including in New York, Switches or vehicles containing Switches, or purchased vehicles and Switches that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase Switches or vehicles that they would have otherwise have purchased absent the illegal conduct.

b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected New York commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

91.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

    a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs, including those who resided in North Carolina and/or purchased Switches or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs, including those who resided in North Carolina and/or purchased Switches or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches, including in North Carolina.

    b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected North Carolina commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Accordingly, Plaintiffs seek all relief available under North Carolina General Statutes §§ 75-1, *et seq.*

92.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705*, et seq.*

a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Oregon (2) Switches prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected Oregon commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

93.     Specifically, Plaintiff Group 1 Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: California, Kansas, Mississippi, New Hampshire, New Mexico, and New York.

94.     Plaintiff Asbury Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: California, Mississippi, North Carolina, and Oregon.

95.     Plaintiff VTG Automotive brings claims pursuant to the state statutes as set forth

above against Defendants for the following states: Arizona, California, Nebraska, and New Mexico.

96.     Plaintiffs Major Automotive, City World Motors, and Bronx Ford bring claims pursuant to the New York statutes set forth above against Defendants.

97.     Plaintiffs, having purchased new automobiles containing Switches and/or replacement parts for Switches in the above states, as set forth in Paragraphs 83–96 *supra* have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.   Plaintiffs have paid more for Switches or vehicles containing Switches than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

98.     Defendants' violations of the above-listed state laws, as set forth in Paragraphs 83–96 *supra* have proximately caused the injuries sustained by Plaintiffs.

99.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct some at the expense and detriment of Plaintiffs.

100.    Accordingly, Plaintiffs seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust or consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### c.   Count 3 – Violation of State Law Consumer Protection Statutes

101.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

102.    Defendants knowingly engaged in unfair competition or unfair, unconscionable,

deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

103.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Arkansas Code Annotated, § 4-88-101.

    a.   Defendants knowingly agreed to, and did in fact act in, restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Switches were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs.

    b.   The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

    c.   Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

    d.   During the Relevant Time Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

    e.   As a direct and proximate result of the unlawful conduct of Defendants, have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs seek all relief available under that statute.

104. The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the California Business and Professions Code, §§17200, *et seq.*

a. During the Relevant Time Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected California commerce and consumers.

c. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d. Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the

following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

e.   Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.   Defendants' acts or practices are unfair to purchasers of Switches (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.   Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout California; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs, including those who resided in California and/ or purchased Switches or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs, including those who resided in California and/or purchased Switches or vehicles in California, paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches, including in California.

h.   Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

i.   Plaintiffs are entitled to full restitution and/or disgorgement of all revenues,

earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

j.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

k.   As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

105.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201, *et seq.*

a.   Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout Florida; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs were deprived of free and open petition; (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches.

b.   During the Relevant Time Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers of Switches and vehicles in Florida.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs seek all relief available under that statute.

106.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

a.  Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at noncompetitive and artificially inflated levels, the prices at which Switches were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs.

b.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Switches. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Switches because they were unaware of the unlawful overcharge and because they had to purchase Switches in order to be able to operate their vehicles. Defendants' conduct with regard to sales of Switches, including their illegal conspiracy to secretly fix the price of Switches at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-

sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

c. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the prices paid by them for Switches as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs for vehicles and Switches.

d. Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

e. During the Relevant Time Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

f. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured and are threatened with further injury.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs seek all relief available under that statute.

107. The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

a. The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Switches were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

b. Defendants deceptively led purchasers, such as Plaintiffs, to believe that the Switches they had purchased as replacements and inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

c. The conduct of the Defendants described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

d. The Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout New York; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs, including those who resided in New York and/or purchased Switches or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs, including those who resided in New York and/or purchased Switches or vehicles in New York, paid supra-competitive, artificially inflated prices for Switches, including in New York.

e.  Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Switches were misled to believe that they were paying a fair price for Switches or the price increases for Switches were for valid business reasons; and similarly situated purchasers were affected by Defendants' conspiracy.

f.  During the Relevant Time Period, the Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

g.  During the Relevant Time Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Switches in New York.

h.  Defendants knew that their unlawful trade practices with respect to pricing Switches would have a broad impact, causing Plaintiffs who indirectly purchased Switches to be injured by paying more for Switches than they would have paid in the absence of Defendants' unlawful trade acts and practices.

i.  Plaintiffs seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

108.  The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

a.  The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Switches were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs.

b. The conduct of the Defendants described herein constitutes consumer oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

c. The Defendants' unlawful conduct had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs, including those who resided in North Carolina and/or purchased Switches or vehicles in North Carolina were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs, including those who resided in North Carolina and/or purchased Switches or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Switches, including in North Carolina.

d. During the Relevant Time Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers in North Carolina.

e. Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

f.   During the Relevant Time Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Switches in North Carolina.

g.   Plaintiffs seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs seek all relief available under that statute.

109.   The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

a.   Defendants' combinations or conspiracies had the following effects: (1) Switches price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Switches prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Switches and vehicles containing Switches.

b.   During the Relevant Time Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, Plaintiffs seek all relief available under that statute.

110.   Specifically, Plaintiff Group 1 Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: California, Florida, New Mexico, New York, and South Carolina.

111.   Plaintiff Asbury Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: Arkansas, California, Florida, North Carolina, and South Carolina.

112.   Plaintiff VTG brings claims pursuant to the state statutes as set forth above against Defendants for the following states: Florida, California, and New Mexico.

113.   Plaintiffs Major Automotive, City World Motors, and Bronx Ford bring claims pursuant to the New York statutes set forth above against Defendants.

**d.   Count 4 – Unjust Enrichment**

114.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

115.   Plaintiffs Group 1 Automotive, Asbury Automotive, and VTG bring this claim under the laws of all states listed in Count 2 and Count 3 *supra*, except California.   Plaintiff Group 1 Automotive also brings this claim under the laws of Massachusetts.   Plaintiff Asbury Automotive also brings this claim under the laws of Missouri.   Plaintiff VTG also brings this claim under the laws of Missouri and Illinois.

116.   Plaintiffs Major Automotive, City World Motors, and Bronx Ford bring this claim under the laws of New York.

117.   As a result of their unlawful conduct described above, Defendant have and will

continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Switches

118.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs for Switches.

119.    Plaintiffs are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

120.    Pursuit of any remedies against the OEMs from whom Plaintiffs purchased vehicles containing Switches would have been futile, given that those OEMs did not take part in Defendants' conspiracy.

## IX. DEMAND FOR JURY TRIAL

121.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand that, at the trial of this cause, a jury be empaneled to determine all disputed issues of fact.

## X.  PRAYER

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.  An injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein;

2.  Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

3.  Restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and unjust enrichment;

4.   An award of the cost of the suit, including a reasonable attorney's fee; and

5.   Such other and further relief as the Court deems just, equitable, and proper.


DATED:  May 20, 2020.                    Respectfully submitted,

*/s/ Andrew G. Pate*
Michael B. Angelovich
Texas Bar No. 00785666
Jeffrey J. Angelovich
Texas Bar No. 00786988
Andrew G. Pate
Texas Bar No. 24079111
Winn Cutler
Texas Bar No. 24084364
**NIX PATTERSON, LLP**
3600 N. Capital of Texas Hwy.
Bldg. B, Suite 350
Austin, TX  78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
Email:  mangelovich@nixlaw.com
jangelovich@nixlaw.com
dpate@nixlaw.com
winncutler@nixlaw.com

Keith Butler
California Bar No. 215670
**STRANGE & BUTLER LLP**
12100 Wilshire Blvd.
Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210
Email: kbutler@strangeandbutler.com

**ATTORNEYS FOR PLAINTIFFS**